IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

RACHEL HAILEY,

Defendant.

CRIMINAL CASE NO.
1:15-CR-00332-ELR-LTW

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This case is before the Court on Defendant Rachel Hailey's ("Defendant") Motion to Suppress Search, Motion to Suppress Statements, and Motion to Reveal Identity and Location of Confidential Informant. (Docs. 12, 13, 28). Having considered Defendant's motions and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant's Motion to Suppress Search and Motion to Suppress Statements be **DENIED**. (Docs. 12, 13). As for Defendant's Motion to Reveal Identity and Location of Confidential Informant, as discussed below, the Court will hold an ex parte hearing on the matter. (Doc. 28).

Also before the Court is the Government's Motion Requesting Additional Time to File a Response to Motion to Reveal Identity of and Location of Confidential Informant. (Doc. 32). Therein, the Government requests that the Court extend the time for it to file a response to Defendant's Motion to Reveal Identity and Location of Confidential Informant through and including April 29, 2016, because the Government

wanted the benefit of the March 17, 2016 hearing transcript when preparing its opposition brief.   The Defendant has not filed a response in opposition to the Government's Motion.  For good cause shown, the Government's Motion is **GRANTED NUNC PRO TUNC**.  Doc. 32).

### DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

On September 1, 2015, the Grand Jury indicted Defendant, a United States Postal Service employee entrusted with mail, for embezzling mail intended to be conveyed by United States mail on March 29, 2013, in violation of 18 U.S.C. § 1709.  (Doc. 1). Defendant contends in her Motion to Suppress Statements that statements she made while interrogated at work should be suppressed because they were made to Postal Inspectors under threat of termination and therefore, were coerced in violation of her Fifth Amendment right against self-incrimination.  Defendant further contends that the subsequent searches of her vehicle and her residence were unconstitutionally tainted by the Postal Inspectors' initial coercion of her statements.

### I.   FACTUAL BACKGROUND

At the end of February 2013, Postal Inspector Travis Barnell, whose duties include investigating illegal contraband traveling through the United States mail, met with Defendant in the course of a major drug trafficking investigation.  (Tr. of Mar 17, 2015 Suppression Hrg. (Docket Entry 33), hereinafter "Tr.," 4).  Postal Inspector Barnell, who has sixteen years experience as a Postal Inspector, served as lead case agent in charge of investigating, collecting, and preserving evidence in the case.  (Tr. 46).  Defendant

2

served as the rural mail carrier for the route that services an address in Covington, Georgia (the "target address"), which was of interest in Postal Inspector Barnell's investigation. (Tr. 4). As such, Defendant was responsible for sorting mail directed to her route by address, loading the mail up, and delivering the mail to different customers at different locations. (Tr. 49).

During the meeting, Inspector Barnell and Defendant discussed the individuals who resided at the target address, their cars, and the parcels delivered to them. (Tr. 4-5). Inspector Barnell requested and Defendant agreed to inform Inspector Barnell when packages were to be delivered to the target address prior to their delivery. (Tr. 4-5). When Inspector Barnell had advance notice that a package was expected to be delivered to the target property, Inspector Barnell either would contact Defendant and request that she or her supervisor take pictures of the package prior to delivery or would photograph the parcel himself. (Tr. 36). Inspector Barnell suspected that the packages contained cocaine and marijuana. (Tr. 53).

### A.      Postal Inspectors Receive a Tip that Defendant is Stealing Mail

On March 27, 2013, a law enforcement officer reported to another Postal Inspector that he received information that a carrier from the Covington Post Office was stealing parcels and narcotics from the parcels. (Tr. 7). It was alleged that Defendant was taking packages out of the mail and that she and her boyfriend were selling the drugs which had been in the parcels. (Tr. 16). Inspector Barnell admits that taking items from the mail is a crime which can be punishable by jail time and that postal services employees who

3

do so can lose their jobs and receive administrative sanctions.  (Tr. 50).

Initially, despite the tip, Inspector Barnell did not suspect Defendant.  (Tr. 7). During the course of the investigation, however, the investigation intercepted communications from a source of supply in which the parties to the call discussed a package that was supposed to be delivered to the target address on March 29, 2013, that the tracking showed the package delivered at 11:00 a.m., but that the normal delivery time should have been later in the afternoon, and no one at the address received the package.  (Tr. 8).  Inspector Barnell researched the delivery and learned that Defendant scanned the package indicating that she had delivered the package.  (Tr. 8, 55).  Inspector Barnell contacted Defendant on her cellular phone and asked her if any packages had been delivered to the target address since their last contact.  (Tr. 10).  Defendant informed him that no packages had been delivered since their last contact.  (Tr. 10, 54).

### B.    Postal Inspectors Interview Defendant Twice on March 30, 2013

#### 1.    The First Interview

On March 30, 2013, Inspector Barnell and Inspector Potter arranged a meeting with Defendant through Paula Mills, Defendant's supervisor.  (Tr. 11).  Mills began supervising Defendant in 2005.  (Tr. 75).  The inspectors did not give Defendant prior notice of the meeting.  (Tr. 11).  Inspector Barnell did not intend to arrest or fire Defendant.  (Tr. 11).  In fact, Inspector Barnell did not have authority to discipline Defendant in any way. (Tr. 11).  Inspector Barnell did not administer Miranda or Garrity warnings.  (Tr. 11, 61).  Inspector Barnell did not tell Defendant that she could be facing

4

jail time.  (Tr. 62).

On March 30, 2013, Inspectors Barnell and Potter interviewed Defendant in a conference room at the Covington Carrier Annex, the location where Defendant worked. (Tr. 10-11, 15, 63).  On that day, Supervisor Mills told Defendant that the inspectors needed to speak with her.  (Tr. 76).  During the interview, Defendant sat at the conference room table across from Inspector Barnell and Inspector Potter sat at the end of the table. (Tr. 12).  Defendant sat closest to the door.  (Tr. 12).  Neither inspector was in between Defendant and the door.  (Tr. 12).  The conference room door remained unlocked, but was closed for privacy.  (Tr. 12).  Both inspectors were armed, but their guns were not visible or displayed during the interview, and neither inspector touched their guns during the interview.  (Tr. 12).  Defendant was not handcuffed or physically restrained.  (Tr. 13).  No one told Defendant that she could not leave and no one told her that the interview was mandatory.  (Tr. 13).  Inspector Barnell never instructed Defendant that she was required to answer his questions or that she might be terminated or otherwise sanctioned if she did not answer questions.  (Tr. 14).  No one took Defendant's driver's license or car keys or otherwise did anything to stop Defendant from leaving the room.  (Tr. 13).  Inspector Barnell never left his seat or stood up.  (Tr. 14).

Inspector Barnell questioned Defendant.  (Tr. 14).  Inspector Potter's role was to listen and interject only when Inspector Barnell missed something or something needed to be clarified.  (Tr. 14).  Inspector Barnell admits that he might have raised his voice

5

when interrogating Defendant because doing so is "a normal interview technique if you're trying to get a point across, or you're trying to instill a reaction from the subject being interviewed." (Tr. 14). Defendant never told Inspector Barnell that she did not want to talk to him and never told him that she did not want to answer his questions. (Tr. 15). Defendant never asked for a union representative or a lawyer. (Tr. 15).

During the interview, Defendant told Inspector Barnell that no packages had arrived. (Tr. 15). Defendant also told Inspector Barnell that she had a good relationship with her husband and did not have any problems with work or with family. (Tr. 16). Defendant remained professional, appeared to understand the interview questions, and did not appear to be under the influence of drugs or alcohol. (Tr. 16). Because Defendant exhibited no real signs of deception, Inspector Barnell concluded the interview and advised Defendant that he would have to investigate the matter further. (Tr. 16, 39). Defendant returned to her job duties. (Tr. 39). The first interview lasted approximately fifteen to twenty minutes. (Tr. 38).

> 2. Inspector Barnell Speaks to Defendant's Co-Workers and Contacts the Confidential Source

Following the interview, Inspector Barnell spoke with a couple of Defendant's coworkers. (Tr. 17). One of Defendant's coworkers informed Inspector Barnell that Defendant was dating someone named Nate Dwight and that Defendant was a good person who had been making some bad decisions. (Tr. 17). Inspector Barnell also contacted the confidential source for clarification of Defendant's role. (Tr. 18). The

6

confidential source told Inspector Barnell that Defendant had taken some parcels from the mail, that Dwight would sell the narcotics on the street, and that Dwight and Defendant tried to sell narcotics to the confidential source. (Tr. 18). The confidential source further stated that Defendant and Dwight were living in a motel with Defendant's children and that Defendant bought Dwight a gun. (Tr. 18).

### 3.   The Inspectors Interview Defendant a Second Time

After receiving this information, Inspector Barnell decided to interview Defendant again, and Supervisor Mills told Defendant that the inspectors needed to speak with her again. (Tr. 19, 76). Defendant responded, "okay," and went back into the conference room. (Tr. 76-77). Defendant was not escorted by anyone into the conference room. (Tr. 76). This interview took place approximately an hour after the Defendant's first interview. (Tr. 38). The conference room was generally set up the way it had been in the first meeting, and again, the door was closed, but unlocked during the interview. (Tr. 19, 43-44). Inspector Barnell never told Defendant that she could not leave or indicated that the discussion was mandatory. (Tr. 44). Defendant never tried to leave, and nothing was done to keep her from leaving. (Tr. 44-45). Defendant was not restrained or handcuffed during the interview. (Tr. 19, 44). The inspectors never brandished their weapons during the second interview. (Tr. 44). Neither Miranda, nor  were Garrity warnings administered, and no one advised Defendant that she could be accompanied by a union representative. (Tr. 67-68).

Inspector Barnell advised Defendant that she was not the main target of the

7

investigation, but indicated that he was concerned about her safety and the safety of other mail carriers. (Tr. 19). Inspector Barnell further advised Defendant that she had much to lose "as far as with her kids and stuff" and that she should not be protecting Dwight. (Tr. 19). According to Inspector Barnell, after some time, Defendant confessed that she did take the package originally destined for the target address, that Dwight met her on her route earlier that morning, that she scanned the package as if she had delivered the package, and that Dwight took the package. (Tr. 20). Defendant also wrote and signed a statement at Inspector Barnell's request. (Tr. 20-21; Gov't's Ex. 1). At the time, Inspector Barnell told Defendant that he appreciated that he told her everything and that she had been honest and that he would like her to write a statement "pertaining to that." (Tr. 22). Inspector Barnell also asked Defendant to indicate on the statement the date that the incident occurred and the address to which the parcel was destined. (Tr. 22-23). Inspector Barnell admits that Defendant's admissions within her statement amount to a crime. (Tr. 71). Prior to confessing, Defendant's demeanor had been uptight or reserved, but after the confession, her demeanor became more cordial, relieved, and relaxed. (Tr. 23). The interview lasted approximately ten or fifteen minutes. (Tr. 20).

Supervisor Mills testified that Defendant did not have to speak to the inspectors and that if Defendant had wanted to go home, Mills would not have objected. (Tr. 82, 85). Mills also never threatened to terminate or discipline Defendant if she did not cooperate with the inspectors. (Tr. 81). Indeed, Mills has never disciplined or terminated an employee for failing to admit or deny Postal Inspector allegations. (Tr.

82-83).  Mills, however, never told Defendant that she did not have to speak with the inspectors.  (Tr. 86).  Mills describes Defendant as a "great employee" who has generally performed good work.  (Tr. 74-75).  Mills states that Defendant has never been insubordinate and has always obeyed instructions.  (Tr. 83-84).

### C.   The Inspectors Search Defendant's Home and Car

After Defendant completed her statement, Inspector Barnell asked for Defendant's consent to search her car.  (Tr. 23-24).  Defendant told Inspector Barnell that there was nothing in her car, but did lend her verbal consent to search the car.  (Tr. 24).  During the search, Defendant was not physically restrained in any way.  (Tr. 79).  Inspectors Potter and Barnell conducted the search in the presence of Defendant and her supervisor, but nothing was found during the search.  (Tr. 24, 40-41).  The search lasted no more than fifteen minutes.  (Tr. 40).  Subsequently, Inspector Barnell asked Defendant for her consent to search her home.  (Tr. 24).  Defendant again verbally consented to the search. (Tr. 24).  At the time, both Inspector Barnell and Defendant were both standing beside Defendant's car, they were not restraining her in any way, and Defendant was not handcuffed.  (Tr. 26).

Inspector Potter drove Inspector Barnell and Defendant to Defendant's residence. (Tr. 25).  Defendant rode in the back seat, but was not handcuffed.  (Tr. 24-25).  There was no security gate in the vehicle.  (Tr. 25).  During the trip to Defendant's residence, the occupants of the vehicle engaged in casual, open conversation and Inspector Barnell requested that Defendant fill out a consent to search the residence form.  (Tr. 25; Gov't's

Ex. 2).  Defendant read the form and signed it.  (Tr. 27-28, Gov't's Ex. 2).  The trip from the postal annex to Defendant's home was approximately two miles long.  (Tr. 42).

Upon arriving at Defendant's residence, Defendant used her key to open the door and let the inspectors into her home.  (Tr. 28).  Inspector Barnell stood outside the home while Inspectors Potter, Atkins, and Holder cleared the house to make sure it was safe to enter.  (Tr. 28).  Defendant was not restrained or handcuffed at the time.  (Tr. 29).  Once the inspectors gave the affirmation that there were no safety risks inside the home, Inspector Barnell and Defendant entered and then conversed in the living room.  (Tr. 29).  While Inspector Barnell and Defendant engaged in casual conversation in the living room, none of the other Inspectors were present.  (Tr. 30).  Inspector Potter found green Saran Wrap in Defendant's kitchen trash can that emitted an odor of marijuana which was consistent with what drug traffickers use to wrap and conceal narcotics.  (Tr. 31-33).  Inspector Potter also found a cardboard box in Defendant's kitchen closet upon which had a "PVI label," which is a label affixed to a piece of mail.  (Tr. 31-32, Gov't's Ex. 3-5).  The information on the PVI label was consistent with the amount of postage charged, the zip code of delivery, and the office of mailing of the subject parcel mailed on March 27, 2013.  (Tr. 33).  The address for delivery was missing from the box.  (Tr. 69).  During the search, Defendant never asked the inspectors to stop searching or to leave.  (Tr. 33-34).  Defendant also never requested a lawyer or a union representative.  (Tr. 34).  The search lasted approximately thirty minutes.  (Tr. 42).

After the search, Defendant locked her home and Inspectors Potter and Barnell

rode with Defendant back to the postal annex. (Tr. 34). Upon arriving at the postal annex, Defendant was free to move around as she pleased, but the inspectors kept her within close proximity. (Tr. 34-35, 72). Because Inspector Barnell believed Defendant had taken the missing package and as part of his standard procedure, he wanted to ensure the safety of other employees and ensure that Defendant left the property as directed. (Tr. 34-35, 72). Inspector Barnell also informed Defendant's supervisor Mills what he learned during the investigation. (Tr. 35). Defendant was allowed to leave the postal property on her own at the end of the workday, but Mills placed Defendant on Emergency Placement Leave. (Tr. 26, 43, 79). Defendant was never terminated from her position as mail carrier because a time restriction for performing an investigative interview elapsed. (Tr. 80, 102).

### D.    Special Agent Bowman Interviews Defendant in April 2013

Rodricaus Bowman, who is a Special Agent at the Office of Inspector General ("OIG") responsible for investigating internal crimes and employee misconduct, met with Defendant in April 2013. (Tr. 87-88). Prior to the meeting, postal management sent Defendant a directive to report to work for an interview so that OIG could discuss with Defendant the accusation that Defendant had potentially stolen a piece of mail. (Tr. 88, 97). The notice, dated April 10, 2013, stated that Defendant was scheduled to report for an OIG interview at 10:00 a.m. on April 15, 2013, regarding allegations of mail theft. (Tr. 98; Gov't Ex. 7). The letter further provided:

11

While in a non-pay, non-duty status you are to remain available during the hours of your normal duty schedule.  Your non-response or failure to appear at your scheduled investigative interview time and place may lead to the delay of the investigative process and your waiver of due process rights.  In the event that a delay occurs without sufficient explanation, your absence may be charge to AWOL, Absent without Official Leave.

**Employees are required to comply with ELM Section 665.3 - Cooperation in Investigations**, which states: *Employees must cooperate in any postal investigation, including Office of Inspector General Investigations.*

Failure to report for your scheduled OIG interview will result in disciplinary action up to and including removal from the Postal Service.

(Gov't's Ex. 7) (emphasis in original).  ELM is the Employee Labor Manual and it applies to all postal employees.  (Tr. 103).

Special Agent Bowman did not intend to bring criminal charges against Defendant.  The criminal aspects of the issue were being handled by Postal Inspectors Potter and Barnell of the Inspection Service.  (Tr. 89, 100).  (Tr. 89).  Special Agent Bowman's role was to prepare a report that is basically a statement of facts.  (Tr. 91). Then, postal management would determine whether to discipline or terminate Defendant. (Tr. 100).  It is Special Agent Bowman's understanding that if the employee is found guilty of having stolen mail, they will typically be removed from service.  (Tr. 101).

Defendant, Special Agent Bowman, another agent, and a union representative were invited to the meeting.  (Tr. 88).  The meeting took place in the Postmaster's Office at the Covington Main Post Office.  (Tr. 89).  Special Agent Bowman testified that Defendant was not obligated to stay for the whole interview and was free to leave at any

12

time. (Tr. 91). In fact, Special Agent Bowman told Plaintiff she was free to leave. (Tr. 91). Special Agent Bowman further testified that Defendant was under no obligation to affirm or deny allegations made during the interview, and Special Agent Bowman does not know of any employees who were disciplined or terminated for failing to admit or deny allegations, for leaving an interview before completion, or for staying silent during an interview. (Tr. 91-92). During the interview, Special Agent Bowman administered Garrity warnings. (Tr. 93; Def.'s Ex. 1). In that regard, Special Agent Bowman advised that Defendant's participation in the interview was strictly voluntary and that she could leave at any time. (Tr. 93). Special Agent Bowman also submitted to Defendant a written Garrity warning and acknowledgment of rights form. (Tr. 92-94). After Special Agent Bowman read the form to Defendant in its entirety, Defendant signed the form and acknowledged in writing that she read and understood her rights in the presence of her Union Representative who also signed the form as a witness. (Tr. 92-93, 96; Def.'s Ex. 1).

At the interview, Special Agent Bowman asked Defendant if she had taken a parcel from the mail. (Tr. 94). Defendant denied that she had taken a parcel from the mail and insisted that her prior confession was "all lies." (Tr. 94). Defendant explained that during the prior interviews, she felt threatened that she was going to go to jail and was concerned because no one else was in the room with her. (Tr. 94). Defendant also maintained that she was being told what to write in her statement. (Tr. 94-95). Special Agent Bowman testified that he does not recall Defendant remarking that she was afraid

13

she would be fired or disciplined if she did not talk or confess to the inspectors during the prior interviews.  (Tr. 95).

## II.   <u>LEGAL ANALYSIS</u>

Defendant contends that the statements that she made to Inspectors Barnell and Potter during the interviews on March 30, 2013, should be suppressed because they were compelled at the behest of her employer under the threat of dismissal in violation of the Fifth Amendment of the United State Constitution.[1]  The Government responds that Defendant has failed to show that she was forced to abandon her right against self-incrimination  because she neither received a direct threat of termination nor held an objectively reasonable belief that she was being compelled to confess under penalty of termination from her job.

The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial.  U.S. Const. amend. V; <u>Dickerson v. United States</u>, 530 U.S. 428, 433 (2000); <u>Bram v. United States</u>, 168

---

[1]  Defendant does not appear to be arguing that the statements she made during the April 15, 2013 interview with Special Agent Bowman infringed her Fifth Amendment privilege against self-incrimination.  While at one point Defendant states that she appeared at the April 15, 2013 interview based on the mailed instruction of the Postal Service, she never argues the April 15, 2013 interview was coerced and confines her legal argument to the actions of the Postal Inspectors on March 30, 2013.  (Def.'s May 2016 Br., Doc. 36, at 17-20; Def.'s Sept. 2015 Br., Doc. 13, at ¶¶ 2-3).  To the extent that Defendant wished to assert this argument, she would have to overcome the hurdle that Special Agent Bowman expressly told her that she was free to leave at any time and she signed a written waiver of her rights.  (Tr.  91-96; Def.'s Ex. 1).  Additionally, it appears that the statements made during the April 15, 2013 interview were not incriminating as they basically consisted of her denials and complaints that her statements during the March 30, 2013 interviews were coerced.  (Tr. 94-95).

14

U.S. 532, 542 (1897). "The Fifth Amendment protection is often needed by public employees, for whom Fifth Amendment law attempts to strike a balance between the privilege against self-incrimination and the state's interest in obtaining information necessary for the advancement of governmental functions." United States v. Vangates, 287 F.3d 1315, 1320 (11th Cir. 2002). Thus, "Fifth Amendment protections apply to public employees who, under the threat of job loss, are required to make incriminating statements." United States v. Smith, 821 F.3d 1293, 1302 (11th Cir. 2016)   As the Supreme Court held in Garrity v. New Jersey, 385 U.S. 493, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967), "a public employee may not be coerced into surrendering his Fifth Amendment privilege by threat of being fired or subjected to other sanctions." Smith, 821 F.3d at 1295; see also Vangates, 287 F.3d at 1320.  If a state threatens an employee with termination unless he provides a statement during the course of an internal investigation, it may not use the statement against the employee in a criminal proceeding or prosecution.  Smith, 821 F.3d at 1295.  The touchstone of the Garrity inquiry is whether the defendant's statements were coerced and therefore involuntary. Smith, 821 F.3d at 1303.

In this case, neither Inspector threatened Defendant with termination or other discipline if she did not participate in the March 30, 2013 interview.  Defendant argues instead that the threat was implicit.  The mere possibility of future discipline is not enough to trigger Garrity protections. Smith, 821 F.3d at 1302 (holding that even though administrative regulations required employee to complete a report of unusual incidents

that occur during a shift or tour of duty and to cooperate with investigations by providing information and verbal/written statements and that failure to comply with such regulations could lead to progressive disciplinary sanctions, the mere possibility of future discipline is not enough to trigger <u>Garrity</u> protection).  In the absence of a direct threat of termination, the Court evaluates the defendant's belief that she will face termination if she does not answer questions and the objective circumstances surrounding it.  <u>Smith</u>, 821 F.3d at 1303.  Accordingly, for a government employee's statements to be protected under <u>Garrity</u>, the employee must have believed the statements to be compelled on threat of job loss and the employee's belief must be objectively reasonable under the totality of the circumstances.  <u>Smith</u>, 821 F.3d at 1303-04 (citing <u>Vangates</u>, 287 F.3d at 1321-22 and <u>United States v. Waldon</u>, 363 F.3d 1103, 1112 (11th Cir. 2004)).

In this case, Defendant, who has not testified, has not satisfied the first prong of the test.  <u>Smith</u>, 821 F.3d at 1303 (affirming district court's finding that the defendant, who did not testify at the evidentiary hearing, failed to present evidence that he subjectively believed that he would be terminated if he refused to submit the reports); <u>United States v. Bazile</u>, No. 13-20173-CR, 2013 WL 3776271, at *14 (S.D. Fla. July 17, 2013) (rejecting <u>Garrity</u> claim where there was no evidence that officers performing investigation of fellow officer's possible fraud explicitly threatened officer's job or employment status when obtaining statements from him and there was nothing in the record showing that he believed that he would suffer an adverse employment action if he failed to give a statement).  First, there is no direct evidence that Defendant

16

subjectively believed that the statements that she made in either of the March 30 interviews were compelled on the threat of job loss or even threat of discipline. There is no evidence whatsoever in the record that Defendant made any of her statements because she was afraid that she would be fired or disciplined if she did not answer questions or confess to the inspectors. While Defendant did tell Special Agent Bowman that her prior confession to the inspectors was "all lies" and that she felt threatened that she was going to jail during the prior interviews, her self-serving statement does not comport with her demeanor and actions at the time of the March 30, 2013 interviews. Inspector Barnell credibly testified that during the first interview, Defendant never told Inspector Barnell that she did not want to talk to him and never told him that she did not want to answer his questions. (Tr. 15). Defendant never asked for a union representative or a lawyer. (Tr. 15). Likewise, Inspector Barnell credibly testified that during the second interview, Defendant never tried to leave the interview and nothing was done to keep her from leaving the interview. (Tr. 44-45). While Defendant did appear uptight or reserved during the interview, she remained professional, and consistent with the notion that Defendant was not coerced into confessing, Defendant's demeanor became more cordial, relieved, and relaxed after her confession. (Tr. 16, 23).

Moreover, mere fear of prosecution does not satisfy the subjective prong of the test; Defendant must show that she subjectively believed that she would be *terminated* if she did not submit to interrogation which would violate her right to self-incrimination. See Smith, 821 F.3d at 1303 (holding that subjective belief that written statements might

17

help deflect suspicion and avoid jail rather than help retain employment did not satisfy subjective prong of test); United States v. Hill, No. 1:09-CR-199-TWT, 2010 WL 234798, at *6-7 (N.D. Ga. Jan. 13, 2010) (explaining that Garrity protections did not apply where the defendant indicated that he made statements in an effort to improve jail conditions, to follow departmental policy, and to avoid discipline). Furthermore, with no actual testimony from the Defendant on this matter, Defendant's alleged comment to Special Agent Bowman that she made the statements to the inspectors because she felt threatened that she was going to jail during the prior interviews is not credible. Without more, it appears that Defendant's comment to Special Agent Bowman was merely an after-the-fact attempt to undo the damage from her initial confession.

Defendant further suggests that because postal employees found guilty of stealing from the mail could be removed from the postal service, Defendant subjectively concluded that her job was in jeopardy if she did not answer the inspectors' questions. Again, this Court is unpersuaded. No witness has testified that Defendant's job would be in jeopardy if *she did not answer interview questions*. (Tr. 101). Furthermore, there is no indication that anyone ever told Defendant that she could lose her job if she did not answer interview questions. If all that was required to receive protection under Garrity was fear that revealing facts in an interview about criminal and job misconduct could lead to termination or other sanctions, no public employee would ever be denied Garrity protection.

Defendant also points to Inspector Barnell's testimony that he might have raised

18

his voice at some point during the questioning as being coercive.  There is no discussion in the record, however, as to whether Inspector Barnell actually did raise his voice during the interview or whether his doing so had any coercive impact on Defendant. Additionally, Defendant does not persuasively explain how the volume of Inspector Barnell's voice bore any significance on her perception that refusing to make self-incriminating statements would lead to her termination.  Furthermore, there is also no evidence supporting the notion that Inspector Barnell was particularly intimidating to Defendant; Defendant and Inspector Barnell had a prior professional relationship which had always been cordial.  (Tr. 6, 23).

This Court is also unpersuaded by Hailey's argument that she subjectively believed that she would be terminated if she did not make statements because Inspector Barnell testified that he attempted to persuade her to make statements by telling her that "she had so much to lose as far as with her kids and stuff."  (Tr. 19).  Inspector Barnell's testimony was as follows:

> Basically the line of questioning would have been me basically telling Ms. Hailey that she was not the main target of my investigation, that I had so much more to be concerned about, but I was concerned about her safety, the safety of the other carriers, and that I just needed to get to the bottom of it, and I stressed upon her, you know, she had so much to lose as far as with her kids and stuff, that I was just trying to stress upon her not to be trying to protect Nate or whatever the situation was, you know, trying to get to the bottom of what was going on with the package.

(Tr. 19).  This Court cannot conclude that Defendant interpreted Inspector Barnell's comments as meaning that she could lose her job if she did not make a statement.

19

Defendant never testified and therefore did not explain how she would deduce, based on Inspector Barnell's statements, that she would lose her job. Furthermore, based on the context of Inspector Barnell's testimony, the most reasonable interpretation was that Inspector Barnell was attempting to persuade Defendant to come clean for the safety of Defendant, her family, and other mail carriers. Inspector Barnell never even mentioned Defendant's job, and it is a stretch to interpret Inspector Barnell's statements as a threat to Defendant's job.

Defendant also fails to demonstrate that her belief that her statements to Inspectors Barnell and Potter were compelled on threat of job loss was objectively reasonable. Under the circumstances of this case, it was not reasonable for Defendant to infer that she must make statements or face loss of her job. No one told Defendant that the interview was mandatory, that she could not leave, or that she would be punished or terminated for not participating in the interview. (Tr. 13-14, 44, 76, 81-83). Furthermore, the inspectors did not have authority to discipline Defendant in any way, (Tr. 19, 76). Moreover, the inspectors never made any demonstration of official authority in order to coerce Defendant to answer questions. The inspectors' guns were not visible, they never displayed them, they did not handcuff or physically restrain Defendant, the door remained unlocked, and neither inspector was located between Defendant and the conference room's exit door. (Tr. 12-13, 19, 43-44).

Supervisor Mills, who did have authority to discipline Defendant, played no real role in the interviews. Mills merely told Defendant that the inspectors needed to speak

with her.  (Tr. 19, 76).  Mills never escorted Defendant to the conference room where the inspectors would interview her and was not present during the interviews.  (Tr. 11-12, 74-78).  Additionally, there is no indication within the record that Mills or any other Postal Service Supervisor has terminated or sanctioned employees for failing to respond to questioning by postal inspectors.  (See Tr. 82-83 (noting that Defendant's supervisor has never disciplined or terminated an employee for refusing to admit or deny allegations by a Postal Inspector), 91-92).  Indeed, Mills testified that Defendant did not, in fact, have to speak with the inspectors and that if Defendant had wanted to go home, she would not have objected.  (Tr. 82, 85).  Therefore, under the circumstances, even if Defendant may have believed that her statements to Inspectors Barnell and Potter were compelled on the threat of job loss, her belief was not objectively reasonable.  See United States v. Trevino, 215 F. App'x 319, 321-22 (5th Cir. 2007) (Garrity rights were not violated where officer interrogated defendant regarding potential assault of female citizens but no supervisors were present during the questioning, no one indicated that his job would be in greater jeopardy if he failed to cooperate, and defendant was told that he was free to leave); Waldon, 363 F.3d at 1112 (rejecting police officer's argument that he reasonably believed he would lose his job if he invoked his Fifth Amendment privilege in order to avoid testifying before the grand jury even though city regulations reflected a general expectation that police officers will cooperate and testify and allowed for discipline of employees who exercised their Fifth Amendment rights); Hill, 2010 WL 234796, at *7-8 (finding that defendant's subjective belief that his statements were

compelled was not objectively reasonable even though disciplinary policies provided that adverse action may be taken for refusal to cooperate in an investigation because the defendant did not face any specific threat that such action would be taken in his case, the policies did not specify or promise particular punishments for violations or require that an employee waive his Fifth Amendment rights, and the defendant received no direct order to answer questions); see also Smith, 821 F.3d at 1303 (discussing United States v. Waldon, 363 F.3d 1103 (11th Cir. 2004) and explaining that "Garrity does not stand for the proposition that a statement made in a standard report is coerced whenever an officer faces both the remote possibility of criminal prosecution if he files the report and arguably even speculative possibility of termination if he declines to do so"). Accordingly, Defendant's Motion to Suppress Statements should be **DENIED**.  (Doc. 13).

## DEFENDANT'S MOTION TO SUPPRESS SEARCH

Defendant further contends that any evidence discovered during the search of her car and her home should be suppressed because her consent to the searches was tainted by the inspectors' coercion of her statement.  As discussed above, however, the inspectors did not coerce Defendant's statement.  As a result, Defendant's consent to the searches was not tainted.  Additionally, there is no evidence that Defendant's consent for the searches was anything other than freely and voluntarily given.  Therefore, Defendant's Motion to Suppress Search should be **DENIED**.

## DEFENDANT'S MOTION TO REVEAL IDENTITY AND LOCATION OF

22

## **CONFIDENTIAL INFORMANT**

Defendant contends that she is entitled to disclosure of the identity and location of the confidential informant who revealed to law enforcement that Defendant was allegedly stealing parcels from the mail because the informant was a participant in the events that form the basis of the charges in the instant case.  Defendant further contends that the informant claimed to have been asked to participate in drug sales involving Defendant.  As a result, Defendant argues, the informant's availability and testimony are essential to issues presented by the Motions to Suppress and defenses which may be raised at trial.  The Government responds that disclosure should not be compelled because the informant had no known involvement in the theft of mail on March 29, 2013, for which Defendant was charged.  Instead, Defendant may have previously attempted to sell drugs to the informant before March 29, 2013, and Defendant has not been charged with a crime concerning any illegal activity prior to March 29, 2013.  The Government also argues the informant's role was inconsequential because the informant was not a "sole participant" other than Defendant in the charged transaction, and there is no reason to believe that the informant participated at all in the charged theft.  The Government further contends that the informant's identity should not be revealed because Defendant has not shown that the informant's probable testimony would bear a direct relationship to her asserted defense.  Additionally, the Government argues, the Government's interest in protecting the informant's anonymity outweighs Defendant's interest in learning the informant's identity.  Finally, the Government argues Defendant's

AO 72A
(Rev.8/82)

Motion is premature because the Government has not yet determined whether it will call the informant as a witness at trial.

The Government has a limited privilege to withhold the identity of a confidential informant. Roviaro v. United States, 353 U.S. 53, 60-61 (1957); United States v. Flores, 572 F.3d 1254, 1265 (11th Cir. 2009). In Roviaro, the Supreme Court held, however, that "[w]here the disclosure of a confidential informer's identity or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause, the privilege must give way." Flores, 572 F.3d at 1265 (citing Roviaro, 353 U.S. at 60, and holding that here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way). Under such circumstances, the public interest in protecting the flow of information is balanced against the defendant's right to prepare his defense. United States v. Varella, 692 F.2d 1352, 1355 (11th Cir. 1982); United States v. Hughes, 658 F.2d 317, 321 (5th Cir. 1981) ("When confronted with a motion to disclose the address of an informer, a trial judge can call on no fixed rule to guide his decision but must instead balance in each case the benefits to the defendant of disclosure against the resulting harm to the government."). The balancing test principally involves consideration of three factors: "(1) the extent of the informant's participation in the criminal activity; (2) the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant; and (3) the government's interest

24

in nondisclosure." <u>Flores</u>, 572 F.3d at 1265.  "The government's interest may be proven by showing that disclosure might endanger the informant or other investigations."  <u>Id.</u> (citing <u>United States v. Tenorio-Angel</u>, 756 F.2d 1505, 1509 (11th Cir. 1985)).

In this case, however, it would be inadvisable for the Court to rule on the Defendant's Motion without a hearing because the Court does not have the information it needs to determine whether disclosure is required.  <u>See</u> <u>United States v. Vann</u>, 336 F. App'x 944, 950 (11th Cir. 2009) (explaining that an in camera hearing is not required if the trial court has the information necessary to determine if disclosure of the informant's identity is required); <u>Tenorio-Angel</u>, 756 F.2d at 1509 n.7 (11th Cir. 1985) (explaining that whether an in camera hearing is required depends on whether the trial court has the information necessary to determine if disclosure of the informant's identity is required without holding the hearing).  One important factor in the balancing test is the degree of participation exercised by the informant.  <u>Varella</u>, 692 F.2d at 1355.  When the informant is only a tipster and not an active participant in the criminal activity charged, disclosure is typically not required.  <u>United States v. Atkinson</u>, 209 F. App'x 957, 967-68 (11th Cir. 2006); <u>United States v. Young</u>, 161 F. App'x 922, 927 (11th Cir. 2006); <u>Varella</u>, 692 F.2d at 1355-56.  Where the informer, however, has played a crucial role in the alleged criminal transaction, disclosure and production of the informer are often required to ensure a fair trial.  <u>Young</u>, 161 F. App'x at 927; <u>Varella</u>, 692 F.2d at 1356.  Here, however, the facts in the record are insufficient for the Court to discern whether the confidential informant was a mere tipster or whether the informant played

some greater role in the actions by the Defendant which led to the charges against her. While the Government asserts in its brief that the confidential informant played no role in the transaction that led to the charges against Defendant, there is no supporting evidence of this fact. <u>Young</u>, 161 F. App'x at 927 (explaining that it was not proper to rely on the Government's assertion that the confidential source was a mere tipster whose participation was unsubstantial without an in camera examination and that in order to strike the balance in the case, the district court was required to find out what the confidential informant's testimony would be). Furthermore, although the Government argues that Defendant only offers conjecture about whether the informant's probable testimony would bear a direct relationship on Defendant's asserted defenses, the Eleventh Circuit has found error where the district court rules against the Defendant based on the notion that the Defendant merely offers conjecture without learning anything about the confidential informant's role. <u>United States v. Rutherford</u>, 175 F.3d 899, 902-03 (11th Cir. 1999) (holding that the district court should have determined what the testimony of a confidential informant would be before dismissing the defendant's assertion that the testimony would materially support his defense); <u>see also</u> <u>Young</u>, 161 F. App'x at 927 (indicating that district court was required to hold a hearing to determine what the testimony of a confidential informant would be before dismissing a defendant's assertion that the testimony would materially support his defense). The Government has also failed to provide much information with respect to the third factor, the Government's interest in nondisclosure. Accordingly, this Court will have an ex parte

hearing on the matter so that the Government may present evidence pertinent to the <u>Roviaro</u> factors and showing the confidential informant's degree of participation or involvement in the alleged criminal activity charged, if any. Accordingly, the Government is **ORDERED** to contact the Court on or before October 27, 2016, in order to set up a time for the ex parte hearing. To the extent that the Government wishes to have the confidential informant testify at trial, the Court will revisit the need for a hearing. To the extent that Defendant desires to have her own ex parte hearing to present further argument or evidence to the Court, her counsel may contact the Court to set up a time.

## CONCLUSION

For the reasons set forth above, this Court **RECOMMENDS** that Defendant's Motion to Suppress Search and Motion to Suppress Statements be **DENIED**. (Docs. 12, 13). The Court will hold an ex parte hearing on Defendant's Motion to Reveal Identity and Location of Confidential Informant. (Doc. 28). The Government's Motion Requesting Additional Time to File a Response to Motion to Reveal Identity of and Location of Confidential Informant is **GRANTED NUNC PRO TUNC**. (Doc. 32).

**SO ORDERED, REPORTED AND RECOMMENDED** this   21   day of October, 2016.

/s/LINDA T. WALKER
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

27